494 P.2d 519

The STATE of Utah, Plaintiff and
Respondent,

v.

Bennett Merl BELWOOD, Defendant
and Appellant.

No. 12548.

Supreme Court of Utah.

Feb. 29, 1972.

Robert Van Sciver, Salt Lake City, for
defendant and appellant.

Vernon B. Romney, Atty. Gen., David S.
Young, William T. Evans, Asst. Attys.

Gen., Salt Lake City, for plaintiff and re-spondent.

TUCKETT, Justice:

The defendant was charged in the district court of Tooele County with the crime of murder in the first degree. Later, on motion of the defendant, a change of venue was granted and a trial upon the charge was conducted in Salt Lake County. The defendant was found guilty and the defendant was sentenced to suffer death.

The defendant is here seeking a reversal of his conviction and in the alternative for a new trial.

On July 9, 1970, in an area known as Big Hollow Canyon in Tooele County, a body was discovered by two men who were cutting cedar trees. The body was later identified as that of Ronald Paul Smith. During the evening of July 8, the defendant and Ronald Paul Smith were together in Tooele City, Utah, where they were drinking beer and driving about the streets. At about 1:30 A.M. of the following day the defendant and Smith went to the home of the co-defendant Ruth Breece where the defendant obtained a small caliber pistol. Thereafter the defendant, Smith, and Ruth Breece set out for Dugway Proving Grounds, an Army installation located in Tooele County. The defendant's purpose in going to the military post was to present a claim to the authorities there. At the gate to the post the trio were turned away due to the early hour. They then drove to the vicinity of Big Hollow Canyon where they parked the automobile and the two men left afoot for the purpose of doing some shooting and hunting. Defendant shot Smith twice in the head and returned to the automobile.

A complaint was filed in the Tooele City Court charging the defendant with the crime of murder and subsequently the defendant was arrested at Dutch John, Utah, and returned to Tooele County to face the charge. Prior to the defendant's appearance in the Tooele City Court for the preliminary hearing, he made a full and complete confession of his participation in the crime charged against him to the sheriff and his deputy. The defendant's statement was taken in shorthand and thereafter transcribed by a secretary who worked in the sheriff's office. The defendant's statement related in detail his participation in the crime as well as the events preceding the occurrence.

After the defendant had been held to answer to the charge of murder in the first degree in the district court of Tooele County, he entered a plea of not guilty, and also a plea of not guilty by reason of his insanity.

During the course of the trial and after the state had rested its case, the defendant took the stand and then testified as to certain matters for the purpose of laying a foundation for the introduction of expert

testimony bearing upon his defense of insanity. He was asked by defense counsel as to the amount of a drug known as Valium which the defendant had taken on the day and evening preceding the killing. The drug, a tranquilizer, was one which had been prescribed by a physician for the defendant two or three years prior. The defendant was also questioned as to his consumption of beer on the evening prior to the defendant and the victim going to Dugway. The defendant testified as to the effect of the beer and the drug upon his mental processes during the period we are here concerned with. The defendant also answered as to his being a patient in a mental institution in the state of Oregon and the Utah State Mental Hospital at Provo. The district attorney was permitted, over the objection of the defendant, to cross-examine him concerning conviction for prior felonies [1] and the diagnosis of the defendant resulting from evaluation made by the mental hospitals in which the defendant was a patient. The district attorney was also permitted to cross-examine the defendant in great detail as to the events which transpired during the evening and the night leading up to the killing of Smith.

The defendant strongly urges that it was prejudicial error for the Court to permit the district attorney to go beyond the scope of the direct examination to such great breadth. With this claim we are inclined to agree. In this state the penalty for murder in the first degree is that the defendant shall suffer death, or upon recommendation of the jury the defendant may be imprisoned for life in the discretion of the court. In this type of case the jury had two functions to perform, namely, the finding of guilt or innocence, and if the finding is guilty, whether the defendant should suffer death or his punishment be left to the mercy of the court. In this case the confession of the defendant had been admitted in evidence and was before the jury for consideration. The confession taken together with the evidence presented by the state is more than ample to establish the guilt of the defendant beyond a reasonable doubt. It should be noted that the defendant, during his direct examination, did not deny that he had killed Smith.

■■ The cross-examination of the defendant in the criminal proceeding is governed by the provisions of Sec. 77-44-5, U.C.A.1953, which provide as follows:

> If a defendant offers himself as a witness, he may be cross-examined by the counsel for the state the same as any other witness. . . .

The scope of the cross-examination of a defendant by the prosecutor is largely with-

1. Section 78-24-9, U.C.A. 1953.

in the discretion of the trial court and unless there is an abuse of discretion this court will not ordinarily interfere. However, in this case, it would seem to us that the court did abuse its discretion in permitting the prosecutor to go far beyond the scope of direct examination. It would seem that the purpose of the cross-examination did not go to the issue of the guilt or innocence of the defendant, but rather to his punishment.[2]

In view of the fact that this matter must be returned to the district court for a new trial, we feel it necessary to comment upon one other aspect of the case. During the voir dire examination of the prospective jurors one of the jurors indicated that she had qualms about the death penalty. The district attorney proceeded to question her at length about her mental attitude concerning capital punishment and whether or not she would return a recommendation of leniency even though she believed the defendant to be guilty of murder in the first degree. After further questioning, of which it would appear from the record tended to confuse the prospective juror, she was excused for cause. The matter of challenge for implied bias is governed by the provisions of Sec. 77–30–19 and the matter we are here concerned with is dealt with in subsection 9 of that section which reads as follows:

If the offense charged is punishable with death, the entertaining of such conscientious opinions as would preclude his finding of the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror.

It would seem that the statute would only permit a challenge for cause in the case of a prospective juror whose conscientious opinions are such as would preclude his finding the defendant guilty. The state is not entitled to have a panel of jurors comprised of only those members of the community who are in favor of the death penalty in capital cases.[3]

The defendant contends that he is entitled to a reversal on a number of other grounds, namely, that the court admitted evidence which he claimed was obtained as a result of an illegal arrest and an illegal search and seizure of the defendant's automobile. He also claims that the court erred in admitting his confession in evidence. We have carefully considered these claimed errors and find that they are without merit.

We are of the opinion that this matter should be remanded for a new trial and such is the order.

HENRIOD, J., concurs.

2. State v. Shockley, 29 Utah 25, 80 P. 865; State v. Vance, 38 Utah 1, 110 P. 434; Wharton's Criminal Evidence, 12th Ed., Vol. 3, p. 294, Sec. 889; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

3. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

**218**

CROCKETT, Justice (concurring):

I concur in granting the defendant a new trial. In doing so I note my agreement with the principle stated in our statutory and decisional law that there should be no reversal of a judgment merely because of technical error, but only if it is substantial and prejudicial.[1] Were the rule otherwise, the reversal of a judgment and the granting of a new trial would be an exercise in futility by having another trial to obtain the same result. Because of that fact and other unsatisfactory aspects of undue delay, difficulty and expense, the whole process of enforcing the law and administering justice would suffer by adding to the already too evident loss of public respect. However, without losing sight of the propositions just stated, in assuring equal justice to all, there is another side of this picture which must be taken into account. Where the life of a human being is in hazard, it is incumbent as a part of human decency and good conscience to be extremely cautious in making sure that the rights of the accused have been safeguarded to the end that he has a fair trial by an impartial court and jury.

Upon reading of the voir dire examination of the jury panel it seems to me that the jurors may have gained the impression that in order to be qualified as jurors they should be of such frame of mind that if they found the defendant guilty of murder in the first degree they ought to impose the death penalty. This is illustrated by the questioning of the juror Mrs. Hedwig Maass who was challenged by the district attorney and was excused over the objection of the defendant. In the interest of brevity only portions are quoted, but in my judgment, the following fairly shows both sides of the question:

Mr. Banks: I'll ask you, are you opposed to capital punishment?

Mrs. Maass: Yes.

Mr. Banks: In any instance, can you see where a death penalty would be justified?

Mr. Van Sciver: That's not proper. (discussion of the objection)

The Court: The question may stand. What's your answer?

Mr. Banks: I asked you if you were opposed to capital punishment?

Mrs. Maass: Maybe I should say that I'm opposed to it. If I don't believe in it—

Mr. Banks: Now, I'll ask you if you would always return a recommendation of leniency if you believed the defendant to be guilty of murder in the first degree beyond a reasonable doubt?

Mrs. Maass: *I guess I couldn't make the opinion until I've heard the facts.*

1. Sec. 77–42–1, U.C.A. 1953; State v. Estes, 52 Utah 572, 176 P. 271; State v. Siddoway, 61 Utah 189, 211 P. 968.

Mr. Banks: I take it, then, *in some instances* you could see where the death penalty would be justified, is that correct?

Mrs. Maass: *Yes.*

\* \* \* \* \* \*

Mr. Banks: I'll ask you, with your attitude on capital punishment, would it ever prevent you from returning a verdict of guilty of murder in the first degree, even though you believed the evidence supported such a charge?

Mrs. Maass: Could be. I would recommend leniency.

\* \* \* \* \* \*

Mr. Banks: Let me ask you this. Knowing that a judge may not follow the recommendation of leniency, based on your attitude towards death, would you be inclined to return a verdict of murder in the second degree rather than a verdict of guilty of murder in the first degree, even though you believed that the evidence showed a defendant to be guilty of murder in the first degree?

Mrs. Maass: Well, I don't think so.

\* \* \* \* \* \*

Mrs. Maass: I guess I'm a little bit confused . . .

Mr. Banks: I'll try to make it a little simpler. If you believed that the evidence showed a defendant to be guilty of murder in the first degree beyond a reasonable doubt, *and you knew that the judge might not follow a recommendation of leniency*, rather than returning a verdict of guilty of murder in the first degree, would you return a verdict of murder in the second degree because you knew that that took it out of the judge's hands?

Mrs. Maass: Yes.

Mr. Banks: I'll challenge the juror for cause, Your Honor.

The Court: Do you want to make any objections?

Mr. Van Sciver: Yes, I'll except.

The Court: You're excused, Mrs. Maass. Thank you.

I am in accord with the idea that a juror cannot be a law unto himself; and that he must be able to answer without reservation that he will accept and follow the law as instructed by the court regardless of what he may personally believe it is or ought to be. But in a case involving first-degree murder, the juror has not only the responsibility of determining guilt or innocence, but in the event the verdict is guilty, he has the further responsibility of determining whether he will make the recommendation of leniency. His state of mind should be such that he is entirely free to make or not to make that recommendation on the basis of what he perceives in the trial, and not because of any predisposition to a result because of bias or prejudice one way or the other.

It does not strike me as being anything out of the ordinary for a juror to express some compunction and serious concern about the death penalty generally. I do not see the justification for the conjecture in the statement, ". . . that *the judge might not follow* a recommendation of leniency . . ." The fact is that with extremely rare exceptions, trial judges do follow such a recommendation. My impression from the entire colloquy: that there could very well have emerged in the mind of a juror the idea that if the verdict should be murder in the first degree, the death penalty ought to be imposed, does not comport with the requirement of our law. If the questions and answers of Mrs. Maass are considered in the composite, as they should be, I fail to find therein any basis for concluding that she was so biased or prejudiced as to disqualify her as a juror. Persuasively pointing to the contrary are her statements that she "shouldn't form the opinion until I have heard the facts . . ." and her affirmative answer that " . . . in some instances . . . [she] . . . could see where the death penalty would be justified . . ."

Considering whether prejudicial error was committed in excusing this juror involves the total effect it may have had upon the trial. It seems hardly to be gainsaid that the questioning and the result reached with respect to Mrs. Maass in the presence of the entire panel may well also have had an improper influence upon the other jurors. For the reasons stated herein, I have serious doubt that the defendant has been given his entitlement of a trial by a fair and impartial jury.[2] Accordingly, I concur in the reversal of the judgment and the remand for a new trial. (All emphasis mine.)

ELLETT, Justice (dissenting):

I dissent. The defendant is a cold-blooded murderer by his own confession. The prevailing opinion would give him a new trial on the ground that the trial court abused its discretion in permitting the district attorney to cross-examine the defendant as he did.

The defendant took the witness stand and on direct examination testified that he weighed 130 pounds and that from about four in the afternoon of July 8, 1970, until two in the morning of July 9, 1970, he drank 20 sixteen-ounce cans of beer. He also testified that he took the drug valium at about the same time. He further testified that he had been in mental hospitals, twice in Oregon and once in Utah.

His counsel said he put in only the minimum evidence to lay a foundation—[for a pharmacologist and a psychologist to later testify that the defendant would thus have an alcoholic content in his blood from .210 per cent to .317 per cent by weight and as a

---

2. See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

result the defendant would be confused and emotionally unstable and would have faulty judgment].

The district attorney on cross-examination properly inquired of the defendant if he had been previously convicted of a felony.[1] He then elicited the fact that the defendant remained in the Utah Mental Hospital for a period of three weeks and in an Oregon hospital one and one-half months the first time and had run away from the hospital the second time. Then the district attorney inquired of him what he did during the period of time he claimed to be drinking the 20 cans of beer and got such a detailed response of remembered things that the answers to the pharmacologist and the psychologist to hypothetical questions were not too helpful to the defendant's cause. It was quite clear from the cross-examination of the defendant that he never drank 20 sixteen-ounce cans of beer as he claimed, if the testimony of the experts could be believed.

When the defendant was asked if he remembered getting the gun, his counsel asked if they might approach the bench, and out of the presence of the jury said:

The reason that I have put on very limited direct is because I have to have that as a foundation, and I don't think that by asking him what hospital he's

been in and how much he had to drink and how much valium he had permits Mr. Banks to go through the whole evening all over again, and exactly what's going to happen is he's going to sit up there and continue to deny things. That's going to hurt us in front of the jury. This goes way beyond the scope of direct.

The extent and degree of cross-examination rest in the sound discretion of the judge trying the case.[2] When a defendant offers himself as a witness in his own behalf, his cross-examination is governed by the same rules as that of any other witness, and he may on cross-examination be interrogated concerning his past life insofar as it affects his memory or credibility, and much latitude of inquiry should be permitted in that regard. People v. Hite, 8 Utah 461, 33 P. 254 (1893).

The Hite case, supra, like the instant one was for murder. Hite testified in his own behalf but was very limited in what he said. On appeal he contended that the trial court had permitted the prosecuting attorney to go beyond the direct examination. In affirming the conviction this court at page 473 of the Utah Reports, page 256 of 33 P. said:

In his cross-examination the prosecuting attorney went still further back, and his inquiry descended still further into

---

1. State v. Johnson, 76 Utah 84, 95, 287 P. 909 (1930).

2. Mulliner v. McCornick & Co., 69 Utah 557, 257 P. 658 (1927).

particulars. He interrogated the defendant as to transactions evidently for the purpose of testing his recollection, and of bringing to light conduct that would affect his credibility.

It is the duty of the juror to judge of the credibility of the witness, and to weigh his testimony in the light of his opportunities to know, to understand, and remember, and in view of his motives and his moral worth as evidenced by his conduct, and in view of his character established by his life as well as by the light of experience and reason.

To enable the juror to judge of the credibility of the witness, rigid cross-examinations are sometimes necessary and much latitude of inquiry should be permitted. The investigation of truth is sometimes attended with the humiliation and disgrace of the witness and appears to be remorseless.

As to the tender-hearted juror, I can see no error in peremptorily excusing her from service. The punishment for the crime of murder in the first degree of Utah is death unless on recommendation of leniency by the jury the court otherwise directs. Since conviction can be had only on the unanimous concurrence of all twelve jurors, it is easy to see that it would be impossible to obtain a conviction of first-degree murder if even one juror would not agree to a verdict of guilty of murder in the first degree under any circumstances.

The juror made her position clear when she answered "Yes" to the last question asked by the district attorney, which was:

I'll try to make it a little simpler. If you believed that the evidence showed a defendant to be guilty of murder in the first degree beyond a reasonable doubt, and you knew that the judge might not follow a recommendation of leniency, rather than returning a verdict of guilty of murder in the first degree, would you return a verdict of murder in the second degree because you knew that that took it out of the judge's hands?

I would affirm the conviction and judgment of the trial court.

CALLISTER, C. J., concurs.